**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TERRI L. BOYCE,                )
                                        )
                Plaintiff,          )
                                        )
                 v.             )        02: 04cv0110
                                        )
COMMONWEALTH OF        )
PENNSYLVANIA, DEPARTMENT OF    )
TRANSPORTATION,          )
                                        )
                Defendant.      )

**MEMORANDUM OPINION AND ORDER**

November 22, 2006

        Presently before the Court is the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendant Commonwealth of Pennsylvania, Department of Transportation, the BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT filed by Plaintiff, Terri L. Boyce, and the SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT filed by Defendant .

        The issues have been fully briefed and the matter is ripe for disposition.  After a careful consideration of the motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, Terri L. Boyce, on either her claims of retaliation under Title VII of the Civil Rights Act of 1964 or her claims of disability discrimination under the Rehabilitation Act.  Therefore, the Court will grant the Defendant's motion for summary judgment in its entirety.

**PROCEDURAL BACKGROUND**

Plaintiff Terri L. Boyce ("Plaintiff") filed this civil rights action on January 27, 2004, in which she alleges that Defendant has retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), because she filed a complaint with the Pennsylvania Human Relations Commission in February 2003.  Plaintiff also claims that she was denied a promotion because of a handicap or disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*[1]

Defendant has filed the instant motion for summary judgment in which it contends that Plaintiff is unable to establish a *prima facie* case of retaliation under Title VII and/or disability discrimination under the Rehabilitation Act.   Plaintiff has filed her brief in opposition to the motion for summary judgment.  The matter is ripe for disposition.

**Factual Background**

The facts relevant to this discussion, and viewed in the light most favorable to Plaintiff, are as follows.

*Employment with Commonwealth of Pennsylvania, Department of Transportation*

Plaintiff began her employment with defendant Commonwealth of Pennsylvania, Department of Transportation ("Defendant" or "PennDOT") in 1992 as a temporary employee. In 1993, she began permanent employment as a Real Estate Technician, and was promoted in

---

[1]     The Amended Complaint also alleged claims under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA").  However, the ADA claim was dismissed with prejudice and the PHRA claim was dismissed without prejudice by Memorandum Opinion and Order dated June 14, 2005.

1994 or 1995 to a Real Estate Specialist.  From approximately 1995 to early 2000, Plaintiff

worked as a Real Estate Specialist in PennDOT's District 12 Uniontown office, as the sole

person in charge of the Outdoor Advertising program.

According to Plaintiff, she "loved" her position in the Outdoor Advertising program.

However, in February 2000, Plaintiff was removed from the Outdoor Advertising program, a

change with which she was "very upset."  Dan Bucan ("Bucan") thereafter became her

supervisor.

On July 21, 2000, Defendant issued Plaintiff a notice of Pre-Disciplinary Conference

("PDC") which charged her with several offenses including: destruction of computer programs;

delay in turning over work documents, passwords, and items associated with the Outdoor

Advertising program; refusal to attend scheduled training sessions; leaving work premises

during working hours without permission; a safety violation for not wearing a seatbelt while

conducting Department business; and abuse of time during working hours.  (*Def's Stmt of

Undisputed Facts,* at ¶ 14.)

A PDC was held on July 26, 2000, at which time Plaintiff refused to respond or

comment on her alleged work offenses.   By letter dated October 16, 2000, Plaintiff was

notified that no discipline would be administered for the alleged offenses but instructed that

"behavior of the sort demonstrated by you cannot be condoned or tolerated."

On December 1, 2000, Plaintiff filed a grievance with her Union (# 00-159-2613) in

which she complained of Bucan's treatment of her during a November 29, 2000, general staff

meeting.  According to Plaintiff, Bucan "began accusing, belittling, harassing, and

embarrassing" her in front of her co-workers and allowed others to question and demean her.

3

Plaintiff also complained about Bucan's plan to move her workstation and his statement that "he would not tolerate her taking notes of the conversations and activities of others during work hours." (*Id*. at 17-19.)

On January 12, 2001, Plaintiff filed a Complaint with the PennDOT office of Equal Employment Opportunity ("EEO") which related to the events that occurred at the November 29, 2000, meeting and her problems with her supervisor, Bucan.[2]   Notably, the EEO Complaint did not accuse Bucan of discrimination on the basis of race, color, religion, sex, or national origin.  (*Id.* at ¶ 25.)  On February 21, 2001, a meeting was held between Plaintiff, Bucan, two of his superiors, an EEO representative, and Plaintiff's union representative.  During the course of that meeting all parties agreed to the following:

> "1.     To promote open communication between [Plaintiff] and [Bucan].
>
> 2.     To work in a professional manner and to show respect for one another.
>
> 3.     When a problem arises between [Plaintiff and Bucan], Mr. Myron Hartos will be contacted the solve the problem.
>
> 4.     [Bucan] will distribute work fairly and reframe (sic) from singling [Plaintiff] out.
>
> 5.     Weekly meetings will be held with [Plaintiff] to discuss [her] work performance.
>
> 6.     Assignments will not be in writing but verbally communicated.
>
> 7.     [Plaintiff] will function as a "team player" as in the past, prior to [Bucan] becoming [her] supervisor.

---

[2]     Plaintiff never filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"); therefore, the "2000 EEOC Complaint" referred to by Plaintiff in her Amended Complaint and in her 2003 PHRC Complaint is the January 12, 2001 internal PennDOT EEO complaint.

8.      [Plaintiff] will be permitted to remain in [her] seat as requested."

*Id., Exhibit 8.*

On May 23, 2002, Plaintiff applied for the PennDOT posted job opening for "Right of Way Administrator I."  Plaintiff's co-workers Patricia B. Swisher and Roy Negley also applied for the position.  Separate interviews of the three applicants were conducted on June 27, 2002, by a three-person panel which consisted of  Bucan, Right of Way Administrator II; George W. Tanner, Design Services Engineer; and Donald P. Boord, Chief of Surveys.  During the interviews, each applicant was asked identical questions from a prepared list which inquired into the applicant's technical and managerial skills.  Each candidate was also asked a general question with regard to how he or she dealt with and managed stressful situations.

When answering the general question, Plaintiff began to cry.  Panelist George Tanner asked Plaintiff if she needed to take a break and stated, "I know you have a lot on your plate," or words to that effect.  (*Id.* at ¶ 37).  Plaintiff was able to compose herself and completed the interview without taking a break.   According to the other panelists, both interpreted George Tanner's words as an attempt to offer comfort to Plaintiff.

At the conclusion of the interviews and before any discussion among the panelists took place, each member of the panel submitted an anonymous paper ballot vote which reflected the panelist's first choice for the available position.  The decision was unanimous in favor of Patricia Swisher ("Swisher").  Thereafter, Swisher became Plaintiff's direct supervisor.

On September 6, 2002, Plaintiff submitted various questionnaires to initiate a complaint with the Pennsylvania Human Relations Commission ("PHRC"), which was cross-

filed with the EEOC. In each of the questionnaires, Plaintiff claims that she was being retaliated against for having filed an internal PennDOT EEO complaint in January 2001.

In the Job Related Handicap/Disability (IN-7), General (IN-4) and Retaliation (IN-14) Questionnaires, Plaintiff claims that her supervisor Bucan had singled her out, treated her differently, watched her more closely, not given her the same training opportunities as others, and refused to promote her to the Right of Way Administrator I position in June 2002.

In the Non-Job Related Handicap/Disability Questionnaire, Plaintiff stated that she suffers from "depression, stress, anxiety," that her supervisor singles her out for everything, and "I can't concentrate on my job because I'm always being criticized and nit-picked at." (*Id.* at ¶ 49.) According to Plaintiff, her supervisor made negative comments about her disability, which she identified as George Tanner's comments in the June 2002 interview when he said, "you have a lot on your plate." (*Id.* at ¶ 50.) Plaintiff contends that Defendant inquired about her disability when the interview panel asked "how do you handle stress." (*Id.* at ¶ 51.)

On February 24, 2003, Plaintiff was given notice of a second PDC which pertained to several charges, which included repeatedly leaving the assigned work area without notifying a supervisor; abuse of time; refusal to perform work properly assigned; and "continued activities that a supervisor has directed you to cease, specifically, maintaining, during your work hours, notes regarding other employees' activities." (*Id.* at ¶ 58.)

On February 27, 2003, Plaintiff filed a grievance with her Union (# 03-27-2613) in which she alleged that she was "made to move to various locations to do her work" as discipline imposed by Bucan beginning on February 24, 2003.

The record reflects that on February 28, 2003, Plaintiff filed an Amended Complaint with the PHRC in which she raised numerous retaliation claims against Bucan, including the following:

> (1)  Mr. Daniel Bucan has continually singled the Complainant out for petty problems and has made her document things in a manner that is different from similarly situated employees; made her perform her work segregated from other employees and in intolerable conditions; refused to grant leave or comp time in a discriminatory manner; (2) Failure to adequately document her work assignments or to have an objective party give to her the assignments, thereby creating a hostile work atmosphere and arbitrary discipline procedures.

(*Id.* at ¶ 54.)  In the Amended PHRC Complaint, Plaintiff also contended that she was discriminated against and denied the 2002 promotion because her "history of mental/psychiatric treatment was perceived by her interviewers as a disabling factor in her ability to do the subject job."  (*Id.* at ¶ 55.)

On March 3, 2003, Plaintiff filed another grievance with her Union (# 03-28-2613) in which she alleged that the February 24, 2003, PDC notice had been typed by Bucan and Swisher, rather than a member of clerical staff, in violation of applicable company regulations.

On March 14, 2003, Plaintiff filed a third grievance with her Union (# 03-40-2613) in which she alleged that Swisher "discriminated and demean[ed]" her by assigning specialist work to technicians.  (*Id.* at ¶ 68.)

The Amended Compliant filed with the PHRC was served on Defendant on March 17, 2003.  Prior to that date, Plaintiff did not tell either Bucan or Swisher that she was filing or had filed claims against the Defendant with the PHRC.

On March 21, 2003, Plaintiff filed another grievance with her Union (# 03-42-2613) in which she claimed that both Bucan and Swisher "continue to discriminate [against] me" by assigning specialist work to technicians.

On April 1, 2003, Plaintiff filed her fifth grievance that year with her Union (# 03-45-2613), in which she challenged the assignment of work to technicians; contended that Bucan yelled at her in a general staff meeting on February 20, 2003, and that Swisher had asked her for a leave slip for a cigarette break that Plaintiff had taken on February 24, 2003; that her work station was moved around from February 24, 2003, through February 25, 2003; and that she was reprimanded for taking notes on her co-workers during office hours.  (*Id*. at ¶ 70.)

On July 13, 2004, PennDOT announced that Swisher had been laterally transferred to another position within the unit. Following Swisher's lateral transfer, Bucan again became the direct supervisor of the Real Estate Specialists, including Plaintiff.

On July 14, 2004, the first day that Bucan resumed his direct supervision of the Real Estate Specialists, Bucan arrived at work at 7:30 a.m. and noticed that Plaintiff, who was scheduled to begin work at 7:00 a.m., was not at her work station.  When Plaintiff was still not at her work station by 7:45 a.m., Bucan began to look for her and eventually found her in the building coffee shop.  Bucan and Plaintiff returned to the PennDOT office, and Bucan requested that Plaintiff file an appropriate leave slip to account for her unauthorized break time. When Plaintiff refused, an argument ensued between the two.

On August 17, 2004, Plaintiff was issued an official written notice of Alternative Discipline in Lieu of Suspension ("ADLS") for failing to meet several established assignment

deadlines in June and July 2004, and refusing direct orders on July 14 and 15, 2004, to notify her supervisor when leaving her work area during working hours.  (*Id.* at ¶ 81.)

On August 31, 2004, Plaintiff filed a grievance with her union (# 04-051-2613) in which she alleged that she was "disciplined without just cause," presumably in reference to the August 17, 2004, ADLS.  This grievance was resolved by a subsequent Corrective Action Plan. *See* Exhibit 25.

*Plaintiff's Treatment for Stress and Depression*

Plaintiff first began treatment with psychiatrist Scott Gleditsch, M.D., and psychologist Richard E. Valinsky, Ph.D., shortly after the death of her seventeen-year old son in 1995.  Plaintiff resumed treatment with Drs. Gleditsch and Valinsky in March 2000, when she was referred to them by her family physician because she had a number of emotional stressors going on in her life other than work.  For example, "her mother-in-law moved in with Boyce and her husband then died; her daughter was returned from out-of-state by Boyce's ex-husband, the daughter then ran away, was arrested and jailed as an accomplice to a shooting in Mississippi; the daughter was pregnant in jail and began pressuring Boyce to take the baby; Boyce's husband had his hip replaced; and Boyce's husband was taken to court by his ex-wife where the amount of his support payments to her were increased."  (*Id.* at ¶ 9.)  "In 2001, Boyce's daughter again became pregnant in jail, and Boyce has since adopted both children." (*Id.* at ¶ 10.)

During the years, 2000, 2001, and 2002, Plaintiff attended psychotherapy sessions with Dr. Valinski nine times, eight times, and four times per year respectively. (*Id.* at ¶ 12.)

9

Also, during that same time period, she saw her psychiatrist, Dr. Gleditsch approximately once every sixteen (16) weeks.

STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

With respect to summary judgment in discrimination cases, the Court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987).

10

**Discussion**

A.       *Retaliation Claims Brought Under Title VII*

Title VII, 42 U.S.C. § 2000e-3(a), provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice under this Subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Subchapter.

Pursuant to subsection (m) of 42 U.S.C. § 2000e, an unlawful employment practice is established "when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity, and the adverse employment action."  *Moore v. City of Philadelphia,* 461 F.3d 331, 340-41 (3d Cir. 2006).

The United States Supreme Court in *Burlington Northern & Safe Fe Railway v. White,* --- U.S.  ---, 126 S.Ct. 2405, 2414 (June 22, 2006), held that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harms."  The Supreme Court explained that a plaintiff claiming retaliation must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 2415.

11

Defendant argues that Plaintiff's retaliation claim fails because she cannot establish a *prima facie* case of retaliation under Title VII; namely that Plaintiff cannot establish that she engaged in "protected activity."  In order for an employee's complaints to constitute protected activity, the complaint must pertain to conduct that is prohibited by Title VII.  Therefore, a general complaint of unfair treatment does not translate into a charge of illegal discrimination and is not protected conduct under Title VII.  *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 701-02 (3d Cir. 1995) (holding that the plaintiff's letter to the human resources department complaining of unfair treatment in general and not specifically complaining about age discrimination did not constitute protected activity). The complaint must specifically mention the plaintiff's belief that he or she was discriminated against on account of his or her membership in some protected class.  *See id.*

In the instant case, Plaintiff argues that "[t]he protected conduct prong is established through the filing of the PHRC claim, cross-filed with the EEOC."  Pl's Br. at 3.[3]  However, as Defendant correctly notes, neither the original PHRC complaint nor the amended PHRC complaint alleges misconduct within the scope of Title VII, *i.e.,* discrimination on the basis of race, color, sex, religion, or national origin.  Rather, Plaintiff claims that she was retaliated against for filing the internal PennDOT EEO complaint, which by her own admission contained "vague and non-specific" charges.

---

[3]     Plaintiff concedes that her internal EEO complaint against Defendant was "vague and non-specific as to the charges brought."  Plaintiff contends, however, that "the amended complaint to the PHRC included a charge of hostile working conditions which were related to the EEO charge, . . . [and] also included the interviewing incident, that was a product of both her psychiatric history and fit within Bucan's aforementioned pattern of harassing conduct."  Pl's Br. at 1-2.

The undisputed summary judgment record reflects that the 2001 internal EEO complaint consists of a letter dated January 12, 2001, in which Plaintiff complains about the following unfair treatment by Bucan during a staff meeting on November 29, 2000:

- Bucan stated that he was going to move employees around the office and Plaintiff objected to moving her workstation to another spot in the office under a blower;

- Bucan advised the group that Plaintiff was taking notes of everyone in the office and it will not be tolerated;

- Bucan did not chastise an intern who had yelled at Plaintiff about overtime equalization and he should not have discussed with an intern issues being dealt with by the union;

- Bucan accused Plaintiff in front of co-workers of refusing to do work assigned to her;

- Bucan told another specialist to take two new technicians along on some locations, even though Plaintiff had not done one before and should have been asked to go;

- Bucan created a hostile work environment because her coworkers will not trust her and think she is taking notes on them "when in fact my notes pertained to the actions of Dan";

- The day after the meeting, Bucan "asked everyone in the office to go to lunch at Apple Annies in Point Marion except [Plaintiff]";

- Bucan singles her out by monitoring her phone calls and keeping notes on who calls her;

- "Bucan has continually harassed [Plaintiff.]  I have been seeing a therapist and psychologist because of his behavior towards me."

*See Exhibit 8.*

While Plaintiff complains of unfair treatment by her supervisor, she never suggests discrimination within the scope of Title VII.  Indeed, none of the evidence of record  supports an inference that Plaintiff's employer knew she was complaining of discriminatory practices

13

based on her "race, color, religion, sex, or national origin."  A mere reference to being treated

unfairly is insufficient to establish that Plaintiff engaged in protected activity under Title VII.

*See Barber*, 68 F.3d at 701-02; *Gautney v. Amerigas Propane, Inc.,* 107 F. Supp. 2d 634 (E. D.

Pa. 2000) (complaint in general terms of being treated differently was not protected activity)*;*

*DeJoy v. Comcast Cable Communications Inc*., 968 F. Supp. 963 (D. N.J. 1997) (plaintiff's

actions and statements were too vague to be considered "protected conduct").

      For these reasons, the Court concludes that Plaintiff has failed to meet her burden of

establishing a *prima facie* case of Title VII retaliation and summary judgment in Defendant's

favor is appropriate.


B.      *Discrimination Claims Brought Under the Rehabilitation Act*

      Plaintiff alleges discrimination under the Rehabilitation Act claiming that the

interview panel improperly considered her psychological condition when it failed to promote

her.  The standard for liability under the Rehabilitation Act is the same as under the Americans

with Disabilities Act ("ADA").

      The ADA provides that no covered employer "shall discriminate against a qualified

individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, . . . and other

terms, conditions and privileges of employment." *42 U.S.C. § 12112(a)*.  To establish a *prima*

*facie* case of disability discrimination under the ADA, Plaintiff must establish that she:  (1) has

a disability within the meaning of the ADA; (2) is otherwise qualified to perform the essential

functions of the job, with or without reasonable accommodations by the employer; and (3) was

subject to some adverse action as a result of her disability.  *Burskirk v. Apollo Metals*, 307 F.3d

160 (3d Cir. 2002).  Defendant argues that Plaintiff is unable to establish that she is "disabled"

and, thus, is unable to establish a *prima facie* case of disability discrimination.

The ADA defines "disability" as a "physical or mental impairment that substantially

limits one or more of the major life activities of [the] individual."  *42 U.S.C. § 12102(2)(A).* [4]

Under EEOC regulations, an individual is "substantially limited" in a major life activity if he or

she cannot perform the activity, or is significantly restricted as to the condition, manner or

duration of the activity when compared with the average person in the general population*. 29

C.F.R § 1630.2(j)(1); Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 196 (2002).

In "regarded as" cases, the employer must perceive the individual as having an actual

disability under the ADA.  *Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999).

The EEOC's regulations list examples of major life activities, i.e., caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, and working.  *29

C.F.R. § 1630.2(i)*.   Thinking and concentrating are also considered major life activities.  *See

Taylor*, 184 F.3d at 307.

Defendant contends that Plaintiff's "depression and anxiety" is not a disability

because it is not an impairment that substantially limits her in a major life activity.  For

example, it is undisputed that Plaintiff continued to drive, work, and care for her family and she

adopted her daughter's two children during the relevant time period.

---

[4]     For the purpose of this Memorandum Opinion, the Court will assume that
        "depression and anxiety"is an impairment.  Therefore, the analysis will address the
        issue of whether Plaintiff's impairment, i.e., depression and anxiety, substantially
        limits her in one or more major life activities.

15

Even accepting Plaintiff's claim that she had difficulty concentrating at work because she was always on "pins and needles" worrying about what "Bucan was going to do," the Court finds that the summary judgment record is completely devoid of any evidence to suggest an impairment of a major life activity.

Overall, aside from Plaintiff's mere speculation and conclusory allegations, she has not provided any competent evidence that could lead a reasonable fact finder to believe that her "depression and anxiety" substantially limit her in one or more major life activities or that Defendant perceived her as having an actual disability.  Accordingly, the Court finds that Plaintiff has failed to adduce evidence to demonstrate the necessary first prong of her *prima facie* disability discrimination case and, thus, summary judgment in Defendant's favor is appropriate.

### CONCLUSION

Viewing the facts in the light most favorable to Plaintiff, the Court finds that she has failed to meet her burden to establish a *prima facie* case of retaliation under Title VII or disability discrimination under The Rehabilitation Act.

An appropriate Order follows.

McVerry, J.

16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TERRI L. BOYCE,                              )
                                             )
                     Plaintiff,              )
                                             )
          v.                                 )          02: 04cv0110
                                             )
COMMONWEALTH OF                              )
PENNSYLVANIA, DEPARTMENT OF                  )
TRANSPORTATION,                              )
                                             )
                     Defendant.              )

**ORDER OF COURT**

AND NOW, this 22nd day of November, 2006, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the

Motion for Summary Judgment filed by Defendant is **GRANTED** in its entirety and judgment

is hereby entered in favor of Defendant, Commonwealth of Pennsylvania, Department of

Transportation.

The clerk is ordered to docket this case closed.


BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge


cc:      Daniel J. Iler, Esquire
         Email: diler@verizon.net

         Mary Lynch Friedline,
         Senior Deputy Attorney General
         Email: mfriedline@attorneygeneral.gov